IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA SMITH, | ) | CASE NO. 1:08 CV 1949 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OPINION** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Sandra Smith's application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the decision of the Commissioner.

## I.  INTRODUCTION and PROCEDURAL HISTORY

On January 6, 2005, Plaintiff filed applications for Period of Disability, Disability Insurance benefits, and Supplemental Security Income (Tr. 58-60, 708-10).  In her applications, Plaintiff alleged that she became disabled on April 11, 2001 due to the following impairments: herniated discs, empty cell syndrome, Meniere's disease, hiatal hernia, rheumatoid arthritis, glaucoma, hypertension, ovarian cysts, a dislocated right shoulder, paranoid schizophrenia, and depression/anxiety (Tr. 70-71).  The Social Security Administration treated both applications as having a protective filing date of November 18, 2004.

Plaintiff's applications for benefits were denied initially and upon reconsideration (Tr. 48-49, 711, 715).  Plaintiff then requested an administrative hearing (Tr. 57).  On October 22, 2007, Plaintiff appeared with counsel and testified at hearing before Administrative Law Judge Mark M. Carissimi (the "ALJ") (Tr. 719-59).  At the hearing, Plaintiff amended her alleged disability onset date to November 14, 2004 and withdrew her Title II application, as her insured status for purposes of that application had expired on December 31, 2001 (Tr. 19, 724).  Nancy J. Borgeson, a vocation expert ("VE"), also testified at the hearing (Tr. 752-57).

The ALJ issued a written decision on November 15, 2007 in which he found at Step Five of the five-step sequential evaluation[1] that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work and, therefore, was not disabled (Tr. 31).  Specifically,

---

[1]  The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. § 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)    If a claimant is doing substantial gainful activity – i.e., working for profit – he is not disabled.

(2)    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

(3)    If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)    If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

(5)    Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

the ALJ found that Plaintiff retained the capacity to perform sedentary work that accommodated the use of a cane, was simple and routine, did not require high production quotas or piece work, and required only superficial interaction with coworkers and the public with no negotiation or arbitration (Tr. 23).  Based on the VE's testimony at the hearing, the ALJ found that although Plaintiff's RFC did not allow her to perform her past relevant work, Plaintiff could perform such jobs as order clerk, film inspector and/or charge account clerk (Tr. 31). Plaintiff requested review of the ALJ's decision from the Appeals Council (Tr. 13).  The Appeals Council denied Plaintiff's request, thereby making the ALJ's decision the final decision of the Commissioner (Tr. 2-4).  On appeal, Plaintiff claims that the ALJ's decision is not supported by substantial evidence.

Born on June 20, 1965, Plaintiff was 39 years old at the time of her application, 42 years old at the time of the hearing and the ALJ's determination, and a "younger individual" for purposes of the Social Security regulations (Tr. 30, 32, 58, 708).  *See* 20 C.F.R. § 416.963.  Plaintiff had an eighth grade education (Tr. 77).  She has past relevant work as a cook, housekeeper, deli clerk, and assembler (Tr. 750-54).

## II.  DISABILITY STANDARD

A claimant is entitled to receive Security Income only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. § 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20. C.F.R. § 416.905.

### III.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.  ANALYSIS

**A.    Whether the ALJ Erred in Finding that Plaintiff's Right Shoulder Impairment Did Not Constitute a Severe Impairment**

Plaintiff argues that the ALJ erred by failing to find that her right shoulder condition constituted a severe impairment. The "severe impairment" determination at step two of the

sequential analysis has been characterized as a "de minimis hurdle."  *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) ("[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."); 20 C.F.R. § 416.920 (providing that a severe impairment is one which "significantly limits physical or mental ability to do basic work activities" and that "basic work activities" include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling").  The ALJ in this case stated that "[t]he claimant's impairment of right shoulder pain is not considered severe because it does not impose more than a minimal limitation on her his [sic] daily activities (Exhibit 20F, 1).  As Plaintiff notes, the evidence to which the ALJ cites is the first page of an October 13, 2005 discharge summary completed after Plaintiff was admitted at ACMC for multiple pain complaints.  *See* tr. 365.  The discharge summary lists "right shoulder pain" as one of the final diagnoses but notes that an x-ray of Plaintiff's shoulder was normal and that Plaintiff had no active joint inflammation or deformity.  (Id.).

Plaintiff argues that in finding her shoulder condition not to be "severe," the ALJ erred by relying on a single evaluation and ignoring the bulk of the evidence involving this issue.  Plaintiff points to an MRI Plaintiff underwent in 2001 as evidence that her right shoulder pain stems from a medically determinable impairment – i.e., shoulder impingement syndrome (Tr. 217).  Plaintiff argues that although this MRI predates her period of alleged disability, there is nothing in the record to suggest that this condition spontaneously resolved itself.  Plaintiff also points to records from her treating physician, Dr. Lee, and consultative examiner Dr. Bhaiji in support of her argument. Dr. Lee noted that Plaintiff had shoulder pain, a history of shoulder dislocation with surgical correction, and a "markedly" limited range of motion (Tr. 268).  Dr. Bhaiji noted that Plaintiff had difficulty using her hands and wrists due to pain, as well as difficulty with grasping, pinching and fine coordination

(Tr. 283). He diagnosed tendonitis of both wrists (Id.). In response, Defendant argues that the ALJ reasonably relied on the lack of objective evidence to support Plaintiff's complaints of right shoulder pain in determining that she did not have a severe shoulder impairment. Defendant notes in support of this argument Dr. Bhaiji's normal objective findings on examination, that x-rays of Plaintiff's shoulder completed in 2004 and 2005 were normal, and that Plaintiff has undergone three shoulder surgeries since the date of her MRI – thereby undercutting her claim that the record contains no evidence to suggest that her shoulder impingement syndrome "spontaneously resolved itself."

Whether or not the ALJ erred by not finding that Plaintiff's shoulder condition constituted a severe impairment is relevant only if the ALJ failed to consider all impairments at later steps of the analysis. See *Maziarz v. Secretary of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that the Secretary did not commit reversible error in failing to recognize a claimant's cervical condition as a severe impairment because the Secretary still considered the cervical condition in determining the RFC of the claimant). Once an ALJ determines the claimant has one severe impairment, the regulations require the ALJ to consider the limiting effects of all the claimant's severe and non-severe impairments. *Pompa v. Comm'r of Soc. Sec.*, 73 Fed. Appx. 801, 803 (6th Cir. 2003); 20 C.F.R. §404.1545(e).

In this case, the ALJ stated that Plaintiff had established a "severe impairment" within the meaning of the regulations based on evidence of her degenerative disc disease of the lumbar spine, diabetes mellitus, bilateral plantar fasciitis, bilateral foot neuropathy, major depressive disorder, general anxiety disorder, and borderline intellectual functioning (Tr. 21). The ALJ then found that Plaintiff's impairments in combination still allowed her to perform a range of sedentary work that involved lifting, carrying, pushing and pulling 10 pounds occasionally and lesser weights more frequently; standing and walking two hours in an eight-hour workday with the use of a cane; and

sitting six hours in an eight-hour day; only simple routine work; no work requiring high production quotas of piece work; and only work involving superficial interaction with coworkers and the public, and no negotiation or confrontation (Tr. 23).  Notably, Plaintiff does not explain why the ALJ's RFC assessment fails to account for shoulder condition or how it should change.  The ALJ further stated that in making this finding, he "considered *all* symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (Tr. 23) (emphasis added).  Because the ALJ found that Plaintiff satisfied Step Two and the written decision reflects that he considered all of Plaintiff's impairments – including her shoulder condition – at later steps of the analysis, Plaintiff's argument that the ALJ erred by failing to find that her shoulder impairment was "severe" at step two is without merit.

**B.** **Whether the ALJ Erred in His Evaluation of Plaintiff's Marijuana Use**

The Contract with America Act of 1996 ("Welfare Reform Act"), Pub.L.No. 104-121, 110 Stat. 852, 853, prohibits the award of Social Security benefits to individuals whose drug or alcohol addiction is "a contributing factor material to the Commissioner's determination that the individual is disabled."  See 42 U.S.C. §§ 423(d)(2)(C), 1382(a)(3)(J).  A finding of disability is a condition precedent to the application of § 1382(a)(3); thus, "if the claimant is found not disabled, despite whatever limitations he or[] she has, including those related to substance or alcohol abuse, the question of whether [a] claimant's limitations are impacted by such drug and alcohol use is moot." *Parton v. Commr. of Soc. Sec.*, 2008 WL 4657086 at *9 (S.D. Ohio Oct. 21, 2008).

Plaintiff argues that the ALJ failed to evaluate pursuant to the law outlined above whether her drug use was a contributing factor material to her disability. As Defendant notes, the ALJ in this case found that Plaintiff was not disabled, and the ALJ's written decision makes clear that he

considered evidence of Plaintiff's substance use in making that determination.  Thus, the question of whether the ALJ erroneously failed to apply § 1382(a)(3) is moot.

However, that does not end the inquiry.  Plaintiff also argues that the ALJ erroneously used evidence of Plaintiff's drug use as a means of discrediting her testimony and the opinion of her treating physician.    The Court first addresses Plaintiff's argument with respect to the ALJ's credibility assessment.  As stated in *Rogers v. Commr. of Soc. Sec.*, 486 F.3d 234, 247-48 (6th Cir. 2007):

> [i]t is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  However, the ALJ is not free to make credibility determinations based solely upon an intangible or intuitive notion about an individual's credibility. Rather, such determinations must find support in the record . . . . Consistency of the various pieces of information contained in the record should be scrutinized.  Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

(Internal punctuation and citations omitted).  In evaluating Plaintiff's credibility, the ALJ noted that "[a]t the hearing, the claimant admitted that during the period of claimed disability she smoked marijuana once a day with friends.  She further indicated, however, that she had stopped her marijuana use one month before the hearing" (Tr. 25).  He also noted that Plaintiff denied problems with alcohol and drugs to Mr. Halas, and that Plaintiff told Dr. El-Sayegh that she used marijuana for six months on a daily basis two years prior to the interview.

The following exchange took place at the hearing between Plaintiff and the ALJ:

Q:      Okay.  Now, ma'am, I saw in your record that you had a problem with alcohol abuse?

A:      No.

Q:      Well, your psychiatrist said so.

A:      Alcohol abuse?

Q:      Yeah.  So tell me –

A:      I don't even drink.

Q:      Okay.  You don't drink at all?

A:      No.

Q:      Okay.  Was there a time in your life when you drank?

A:      Yes.

Q:      Okay.  And how long – well, when's the last time you had alcohol to drink?

A:      Maybe New Years's –

Q:      Okay.

A:       – I'm thinking.

Q:      New Year's of this year?

A:      Yes.

Q:      Okay.  And nothing since then?

A:      No.

Q:      Okay.  When was it that you had a problem with alcohol?  How long ago was that?

A:      Maybe six years ago.

Q:      Okay.  Did you go through treatment or did you stop –

A:      No, I just stopped.

Q:       – on your own?

A:      I started getting sick and I just stopped everything.

Q:      Okay.  Now, do you smoke marijuana?

A:      Once in awhile I did.

Q:      Okay.  How about now?  Do you still smoke marijuana?

A:      Occasionally.

Q:      Okay.  When's the last time you smoked?

A:      Maybe a month ago.

Q:      Okay.  And when you do smoke marijuana, how – like how often?

A:      Once a day.

Q:      Okay.  So up until a month ago, you were smoking like every day?

A:      No, not every day.

Q:      No, okay.

A:      Maybe once or twice a month.

Q:      Once or twice a month.  Okay.

A:      Yeah.

(Tr. 747-48).

Mr. Halas' records indicate that Plaintiff denied generally any problems with drugs or alcohol (Tr. 275).  Plaintiff also told Mr. Halas that she had never been arrested and had no current charges pending (Tr. 275).  Plaintiff told Dr. El-Sayegh, on the other hand, that although she very rarely drinks alcohol, "she used alcohol for one or two months about ten years ago, consisting of a twelve-pack of beer every other day.  Legal consequences include one DUI in the past" (Tr. 457). She also told Dr. El-Sayegh that used marijuana on a daily basis for about six months two years ago, and that she had "a history of trying acid and crystal meth, but does not have a history of dependence" (Tr. 457).  The ALJ's written decision clearly reflects that he found inconsistencies between Plaintiff's statements at the hearing, her statements to Mr. Halas, and her statements to Dr. El-sayegh.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Although the above evidence is not terribly probative, it does provide some basis from which the ALJ reasonably could have concluded that Plaintiff's statements about her substance use have not been completely consistent.  For instance, although Plaintiff told Dr. El-Sayegh that she had been charged with a DUI in the past, she apparently failed to mention this fact to Mr. Halas, even though he appears to have asked her whether she had ever been arrested.  Additionally, Plaintiff's statements to Dr. El-Sayegh that she used marijuana for six months on a daily basis two years prior to their February 2005 appointment – but no mention to her of current use – are somewhat inconsistent with Plaintiff's testimony at the hearing that she currently used marijuana once or twice a month.  It also is notable that Plaintiff tested positive for THC – the active ingredient in marijuana – during an October 2005 admission to Ashtabula Medical Center (Tr. 28, 397).  Thus, Plaintiff tested positive for marijuana several months after she told Dr. El-Sayegh that she had not used marijuana for two years.  Although there may be other reasons for the seeming inconsistencies between Plaintiff's statements and other evidence at various periods, the Court is not at liberty to disturb the ALJ's findings and inferences if they are reasonably drawn from the record, even if the evidence could support a contrary conclusion.  *See Zarlengo v. Barnhart*, 96 Fed. Appx. 987, 989 (6th Cir. 2004).

However, Plaintiff argues that the ALJ's adverse credibility determination is based on a misinterpretation of her statements. Plaintiff claims that she did not testify that she used marijuana "daily," as the ALJ found, but instead that she used marijuana only once or twice per month. Defendant argues that although the ALJ's reference to "daily" marijuana use appears to be inaccurate, his conclusions are sound because Plaintiff neglected to mention even occasional current

marijuana use to her treating and examining mental health sources.  The Court agrees that the real point here is not how much marijuana Plaintiff uses, but how consistent she has been in her statements about that issue.  Based on the evidence summarized above, the Court finds that the record supports the ALJ's conclusion that Plaintiff's statements about her substance use have not been entirely consistent.  Thus, Defendant's point is well-taken.

Moreover, the ALJ did not base his credibility determination on these statements alone.  In evaluating Plaintiff's credibility, the ALJ discussed most, if not all, of the factors set forth at SSR 96-7p, including Plaintiff's statements about her activities, her medications and the side effects she experienced from those medications, the types of measures Plaintiff takes to reduce her pain and the factors that aggravate her symptoms.  The ALJ then stated that he found Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible.  The ALJ pointed to several reasons for this finding, including the largely normal objective medical evidence, Plaintiff's apparent failure to seek mental health treatment for over two years, and some exaggerations and inconsistencies in Plaintiff's testimony at the hearing.  Regarding the last of these, the ALJ stated:

> she stated that she could not lift anything; however, she stated that she lives alone in a trailer.  After I indicated to her that since she lives alone, there must be some things she can lift, the claimant testified that she can lift her pots, pans and silverware.  She further stated that her daughter checks on her and cooks; however, the claimant related that she can get a bowl of cereal or make a sandwich if she is hungry

(Tr. 25). Based on the above, the Court finds that substantial evidence supports the ALJ's credibility analysis.

As noted above, Plaintiff also argues that the ALJ erroneously used evidence of Plaintiff's drug and alcohol use as a means of discrediting the opinion of her treating physician, Dr. El-Sayegh. The Court addresses this argument in the following section.

**C.     Whether the ALJ Erred in His Assessment of the Opinions of Plaintiff's Treating Physicians**

Plaintiff argues that the ALJ erred in discrediting the opinions of her treating physicians, Dr. El-Sayegh and Dr. Lee.  The Court addresses separately below each of these physicians' opinions and the ALJ's respective treatment of those opinions.

The weighing of medical evidence is the province of the Commissioner.  Where there are conflicting medical opinions resulting from essentially the same objective medical data, it is the responsibility of the ALJ to resolve those conflicts.  *See* *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *see also* *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 803 (6th Cir. 2008). However, the ALJ is bound by the Social Security Regulations when weighing the medical evidence.  *See* *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).  The regulations provide that the opinion of a treating physician generally should receive substantial deference, and complete deference if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 416.927(d)(2); 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 320 (6th Cir. 1987).  A treating physician's opinion typically should be afforded greater weight than those of physicians who have examined the claimant on consultation or who have not examined the claimant at all.  *See* *Meece v. Barnhard*, 192 Fed. Appx. 456, 461 (6th Cir. 2006); *Wilson*, 378 F.3d at 544; *Shelman*, 821 F.2d at 321; *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).  However, an "ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled,

13

[and] may reject determinations of such a physician when good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988).

If an ALJ rejects the opinion of a treating physician, he must articulate clearly "good reasons" for doing so. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). In order to be "good," those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. Unless an ALJ's failure to adhere to this procedural requirement amounts to a harmless, *de minimis* procedural violation, the error is cause for remand. Specifically, the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

**1.    Dr. El-Sayegh**

Plaintiff began treatment with Dr. El-Sayegh, a psychiatrist at North Coast Center, in February 2005 (Tr. 416). Dr. El-Sayegh noted at the intake evaluation that Plaintiff had a history of depression that worsened secondary to pain over the last six months (Tr. 456). Plaintiff reported that she had a past history of drug and alcohol use, but that she had been sober for several years and had not used marijuana for two years (Tr. 457). Dr. El-Sayegh reported that Plaintiff was oriented times three, cooperative and had good eye contact (Tr. 458). Her mood was depressed and her affect was constricted (Id.). She had no active suicidal or homicidal ideation, no delusions and good insight and

judgment (Id.).   Dr. El-Sayegh diagnosed depression secondary to a medical illness and alcohol abuse in remission (Id.).   Plaintiff was prescribed Effexor and psychotherapy, and she applied for Medicaid (Id.).

In October 2005, Dr. El-Sayegh reported that Plaintiff's mood was bad when her pain increased, but that it improved when her pain was better (Tr. 404, 449).   Plaintiff had no suicidal thoughts, and she talked and smiled with good eye contact (Id.).   Dr. El-Sayegh reported in November 2005 that Plaintiff was taking Effexor and Valium for her depressive symptoms (Tr. 416).   She also listed Plaintiff's physical problems (Id.).

In January 2006, Dr. El-Sayegh reported that Plaintiff was feeling better (Tr. 448). Plaintiff's mood had improved and she reported having good family support (Id.). Plaintiff also had a brighter affect; good eye contact; a cooperative, calm demeanor; and no abnormal thoughts, such as suicide, homicide or psychosis (Id.).   She was still taking Effexor and Valium for her psychological symptoms (Id.).   In April 2006, Dr. El-Sayegh reported that Plaintiff was somewhat anxious about an upcoming hysterectomy but hopeful that her pain would lessen (TR. 446).   Plaintiff reported that she was enjoying time spent with her family at Easter, that she had a bright affect and good eye contact, and that she had no suicidal, homicidal or psychotic thoughts (Id.).

In May 2006, Dr. El-Sayegh completed an assessment of Plaintiff's mental functioning (Tr. 439-40).   Dr. El-Sayegh indicated that Plaintiff's abilities to follow work rules; use judgment; function independently; maintain appearance; and  were good (Tr. 439-40).   Plaintiff's abilities to respond to changes in a work setting; deal with the public; interact with co-workers and supervisors; carry out detailed or complex job instructions; socialize; and manage her funds were fair (Id.). Plaintiff's abilities to maintain concentration, persistence, pace and regular attendance and to deal with stress were poor (Id.).

Two months later, in July 2006, Dr. El-Sayegh completed another form assessment.  She indicated that Plaintiff abilities to use judgment and to understand, remember and carry out complex and simple job instructions were good (Tr. 442-43).  Dr. El-Sayegh indicated that Plaintiff's other abilities were fair, except that Plaintiff's abilities to maintain concentration, persistence and pace; deal with stress; complete a workday; socialize; and leave home were poor (Id.).  Dr. El-Sayegh's clinical records from July 2006 reflect that Plaintiff was doing fairly well and had no thoughts of suicide (Tr. 444).  Plaintiff told Dr. El-Sayegh that even if she had fleeting suicidal thoughts, she would never act on them because of all of the people who loved her (Id.).  Dr. El-Sayegh noted that Plaintiff was well-groomed, calm and cooperative (Id.).

In December 2006, Dr. El-Sayegh wrote that Plaintiff was disabled and needed a handicap parking sign for six months (Tr. 486).

In January 2007, Dr. El-Sayegh completed a mental capacity assessment (Tr. 522-24).  She indicated that Plaintiff's abilities to follow work rules; use judgment; understand, remember and carry out detailed, but not complex, job instructions; understand, remember and carry out simple job instructions; maintain her appearance; and manage her funds and schedules were good.  She assessed Plaintiff's functional abilities in other areas as being fair, except that Plaintiff's ability to maintain concentration and attention for extended two-hour periods was poor (Id.).

Dr. El-Sayegh's clinical notes from January 2007 indicate that an increase in Lunesta had not improved Plaintiff's symptoms and might be causing headaches (Tr. 574).  Plaintiff was tolerating and experienced some benefit from an increase in Effexor (Id.).  She reported having some good days and some bad, no hopelessness, and some thoughts of suicide, but no plan (Id.).

Two months later, Plaintiff saw Dr. El-Sayegh again and reported doing well (Tr. 573).  Plaintiff was looking forward to the Easter holiday and had a bright affect (Id.).  The following

month, Plaintiff told Dr. El-Sayegh that her condition was better (Tr. 572).  In June 2007, Plaintiff

reported to Dr. El-Sayegh that she was not sleeping well and stress with her boyfriend, but that she

otherwise was okay (Tr. 571).  She was given a trial of new medication to be monitored in the

following month (Id.).

The ALJ summarized Dr. El-Sayegh's notes and opinions and stated that he did not give

"much weight" to her opinions regarding Plaintiff's psychological limitations.  He explained:

> She completed a total of three assessments and the claimant's mental capacity
> increased then decreased.  However, Dr. El-Sayegh documented that she was doing
> well prior to the more severely restricted assessment.  While Dr. El-Sayegh
> prescribed a handicap parking sign for six months indicating that the claimant was
> disabled[,] I note that she did not treat the claimant for her medical problems but
> rather her psychological impairments. (Exhibit 32F, 2).  Although Dr. El-Sayegh's
> last assessment indicated less restriction than the first two, the disability that she
> proposed is not supported by the evidence as a whole.  I note in particular the
> conflict between Dr. El-Sayegh's assessments and her treatment notes and the
> assessments were made without the claimant revealing daily marijuana use

(Tr. 30).

The ALJ stated earlier in the written decision that he disagreed with Dr. El-Sayegh's

assessment that Plaintiff had a poor ability to maintain attention and concentration for extended two-

hour periods.  He reasoned:

> It is this particular area that I disagree with.  The claimant testified that she smoked
> marijuana with friends and her last use was one month ago from the date of the
> hearing.  Thus, her ability to maintain attention and concentration and indeed her
> depression were all influenced by her consistent use of marijuana.  Therefore, I
> disagree that she was as limited in her ability to concentrate or maintain attention as
> Dr. El-Sayegh suggests.  I feel that Dr. El-Sayegh's opinions are entitled to little
> weight because she was not aware of the claimant's daily marijuana use.

Plaintiff complains that the ALJ's reasons for discounting Dr. El-Sayegh's opinions are not

supported by substantial evidence.  In particular, Plaintiff points to the ALJ's reliance on a mis-

characterization of Plaintiff's testimony as a basis for discrediting Dr. El-Sayegh's concentration

limitations.  The parties do not dispute that the ALJ apparently was mistaken in characterizing

17

Plaintiff's marijuana use as "daily."   However, Defendant argues that despite the mis-characterization, the ALJ's reasoning was valid – in other words, that it makes sense to discount Dr. El-Sayegh's assessment of Plaintiff's concentration limitations because Plaintiff did not reveal to Dr. El-Sayegh the full extent of her marijuana use.

The Court finds that circumstances are somewhat different here than in the context of credibility.  In the context of a credibility assessment, it makes sense to find, based on Plaintiff's somewhat variable statements throughout the record regarding her substance use, that Plaintiff was not always forthcoming about the extent of her use, and this inference weighs against Plaintiff's credibility.  However, it does not necessarily follow that because Plaintiff did not reveal to Dr. El-Sayegh the full extent of her marijuana use, Dr. El-Sayegh's opinion about Plaintiff's ability to concentrate is flawed.  Dr. El-Sayegh's opinion regarding Plaintiff's concentration may have been exactly the same even if she were aware of exactly how much marijuana Plaintiff was using.  Indeed, just because a person's concentration problems stem from substance use does not make them any less severe.  But the record strongly suggests that the ALJ in fact discounted Dr. El-Sayegh's opinion about concentration because he believed that it was a reflection of Plaintiff's "gross" problems – i.e, all of the limitations she experiences, including those caused or exacerbated by her marijuana use. For the reasons outlined in the credibility section, the Court finds it fair to infer that Plaintiff did not reveal the full extent of her use to Dr. El-Sayegh, and that Plaintiff may have been using marijuana at the time that Dr. El-Sayegh recorded Plaintiff's reports and/or gave her opinion. That being the case, Dr. El-Sayegh's opinion may have been a reflection of Plaintiff's gross limitations and, therefore, not necessarily probative of Plaintiff's limitations in the absence of substance use.

18

Furthermore, the circumstances surrounding Plaintiff's marijuana use did not form the sole basis for the ALJ's decision to discount Dr. El-Sayegh's opinion.  The ALJ also explained that Dr. El-Sayegh's assessments of Plaintiff's limitations varied over time and did not always reflect the severity of Plaintiff's symptoms as documented in the treatment notes.  The ALJ also noted that Dr. El-Sayegh was willing to prescribe a handicap parking sign for six months, even though Plaintiff was treating with Dr. El-Sayegh for her mental health issues and not her physical impairments (Tr. 30, 486).  These reasons find support in the record.  Accordingly, Court finds that the ALJ did not err in discounting Dr. El-Sayegh's opinion.

## 2.    Dr. Lee

In February 2005, A. Seenam Lee, M.D., Plaintiff's treating physician, completed a medical questionnaire form (Tr. 267-72).  Dr. Lee first saw Plaintiff in January 2004 and last saw her in February 2005 (Tr. 268).  He listed as Plaintiff's diagnoses hypertension, rheumatoid arthritis, hyperlipidemia, lumbar disc disease, a right shoulder injury, migraine headache, and dyspepsia (Tr. 268).  Plaintiff had a history of right shoulder dislocation with repeated surgical correction (Id.).  She had markedly limited ranges of motion in her right shoulder and chronic pain (Id.).  On October 8, 2004, an x-ray of Plaintiff's right shoulder was normal (Tr. 213).  A cervical spine film showed possible soft tissue spasms (Tr. 214).  A magnetic resonance imaging (MRI) scan of the lumbar spine completed on October 26, 2004 showed a central fusion at L5-S1 and a very small central protrusion at L4-5 (Tr. 272).  Dr. Lee reported that Plaintiff had a poor response to treatment and had physical limitations; she was not a candidate for gainful employment and was disabled (Tr. 269).

In February 2007, Dr. Lee completed a physical capacity form (Tr. 543-44).  Dr. Lee indicated that Plaintiff was not able to lift or carry more than three pounds occasionally during an

19

eight-hour day, and was limited to sitting for one to two hours a day, for 30 minutes at a time (Tr. 543).  She was rarely or never able to climb, balance, stoop, crouch, kneel, or crawl (Tr. 544).  She could occasionally reach, handle, feel, push, pull, and manipulate (Id.).  She had poor tolerance for heights, moving machinery, temperature extremes, and pulmonary irritants (Id.).  According to Dr. Lee, a cane had been prescribed, and Plaintiff needed a sit-stand option (Id.).

In September 2007, Dr. Lee completed a physical capacity form indicating that Plaintiff was able to lift up to 5 pounds occasionally and sit for one to two hours per day (Tr. 706).  Dr. Lee limited Plaintiff's walking and standing to an unspecified degree (Id.).  Dr. Lee stated that Plaintiff was limited by lower back pain from a herniated lumbar disc and arm pain from neuropathy (Id.).  He also stated that Plaintiff had a hard time sitting and ambulating due to back pain (Id.).  Dr. Lee indicated that Plaintiff could never perform any postural activities, such as climbing, balancing, stooping, crouching, kneeling, and crawling, and that she could rarely or never reach, handle, feel, push, pull, or manipulate (Tr. 707).  In response to a question asking Dr. Lee to identify the medical findings that supported his assessment, Dr. Lee indicated that Plaintiff's back and arm pain were the basis for his limitations.  Dr. Lee also noted that Plaintiff had been prescribed a cane, brace and breathing machine (Id.).

The ALJ stated in discounting Dr. Lee's opinions:

As noted above, on February 2, 2007, Dr. Lee opined that the claimant was limited in most areas and she experienced severe pain. On September 17, 2007, he completed another report suggesting increased limitations which reflect an inability to sustain employment.  Although he is a treating source, Dr. Lee's opinion reflects the claimant's statements rather than the objective evidence.  Most importantly, he reported that she had minimal right paracentral disk herniation in a discharge summary dated October 13, 2005 (Exhibit 23F, 2).  The conflict between his documentation with his opinion indicates that he based her limitations on the pain she expressed rather than on diagnostic impressions.  This is clearly illustrated by his own documentation in the reports he provided.  On the report in September 2007, Dr. Lee wrote she could lift five pounds or less due to lower back pain from herniated disc and arm pain from neuropathy.  There is no evidence neuropathies [sic] arm

pain. He wrote "very difficult to ambulate from back pain" and he limited sitting to one to two hours due to back pain. Thus, I give his opinion less weight because his opinion is not supported by evidence; rather it is based on the claimant's statements

(Tr. 29).

Plaintiff claims that the ALJ erred in discrediting Dr. Lee's opinions principally for two reasons. First, Plaintiff claims that the ALJ erred in determining that Dr. Lee's opinion "reflects the claimant's statements rather than the objective evidence" because Dr. Lee's records in fact reflect that Plaintiff has a number of medically determinable impairments, including a minimal right paracentral disk herniation, bilateral ovarian cysts, scoliosis, headache, and right shoulder pain. According to Plaintiff, the ALJ never mentions these diagnoses or the extent to which they may provide support for Dr. Lee's opinions. However, as the ALJ notes, Dr. Lee in fact identified Plaintiff's pain as the reason for many of her impairments, which may indicate that Dr. Lee based many of his assessments on Plaintiff's assertions regarding the severity of her pain rather than the objective evidence. *See* tr. 268-69, 706-07. Additionally, although Plaintiff claims that the ALJ failed to consider the extent to which Plaintiff's various diagnoses may account for her impairments, Dr. Lee also does not explain the ways in which these diagnoses contribute to Plaintiff's impairments. The more evidence a medical source presents to support his opinion and the better his explanation for his opinion, the more weight that opinion should receive. 20 C.F.R. § 416.927(d)(3).

Second, Plaintiff claims that the ALJ erred in rejecting Dr. Lee's opinion that Plaintiff could lift five pounds or less as a result of arm pain from neuropathy. In rejecting this opinion, the ALJ explained that "[t]here is no record evidence establishing neuropathies [sic] arm pain" (Tr. 29). Plaintiff claims that this explanation is erroneous since Dr. Bhaiji in fact diagnosed Plaintiff with tendonitis of the wrists, restricted her ability to handle and feel objects, and documented a reduced range of motion in the shoulders (Tr. 283, 285). It is not entirely clear to the Court why Dr. Bhaiji's

21

assessment that Plaintiff has tendonitis, a restricted ability to handle and feel objects and a reduced range of motion in the shoulders establishes that Plaintiff has neuropathy in her arm, as "neuropathy" refers to a disease or injury affecting the nerves.  Plaintiff does not point to any other evidence indicating that she has neuropathy in her arm.  Based on the above, the Court finds that substantial evidence supports the ALJ's treatment of Dr. Lee's opinion.

## V.  <u>DECISION</u>

For the foregoing reasons, the Court finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

<u>s/ Kenneth S. McHargh</u>
Kenneth S. McHargh
United States Magistrate Judge

Date: <u>March 12, 2010.</u>